## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | **Criminal No. 19-cr-0001** |
| ) | |
| **JAMES PHILLIP, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

**Attorneys:**
**Everard E. Potter, Esq.,**
St. Croix, U.S.V.I.
    *For the United States*

**Michael A. Rogers, Esq.,**
St. Croix, U.S.V.I.
    *For Defendant James Phillip*

## <u>MEMORANDUM OPINION</u>

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant James Phillip's ("Defendant") Motion to Suppress (Dkt. No. 58) ("Motion"); the Government's Opposition thereto (Dkt. No. 61); and the evidence and arguments presented at the suppression hearing. For the following reasons, the Court will deny Defendant's Motion.

### I.      BACKGROUND

On February 19, 2019, the Government filed an Indictment against Defendant charging him with the following offenses: Sex Trafficking, in violation of 18 U.S.C. §§ 1591(a) and 2 (Counts III and IV); and Transportation with Intent to Engage in Criminal Sexual Activity, in violation of 18 U.S.C. § 2423(a) (Counts V and VI). (Dkt. No. 53).[1]

---

[1] Prior to filing the Indictment, the Government commenced this action by filing a Criminal Complaint on November 19, 2018. (Dkt. No. 1). The Government also filed an Information and

On March 8, 2019, Defendant filed a motion seeking to suppress "any photo array, identifications made of [Defendant] in this case, and testimony pertaining to the identification of [Defendant] as well as all statements by [Defendant] to law enforcement officers or other officers of the government." (Dkt. No. 58 at 1). During the subsequent suppression hearing, the Government presented the testimony of one witness, Special Agent Christopher McGrath ("Agent McGrath") of the Department of Homeland Security ("DHS"). The following evidence emerged from the testimony of Agent McGrath and from the Court's review of the photo array and Defendant's videotaped interview.[2]

In 2017, a minor female ("Jane Doe") lodged a complaint with the Virgin Islands Police Department ("VIPD") that on two different occasions, an "older gentleman" paid her boyfriend, Zayvon Acoy ("Acoy"), to have sex with her. Jane Doe informed the VIPD where this "older gentleman" lived and worked. Upon learning this information, DHS Task Force Officer Lawrence James, Jr. conducted an investigation and identified the "older gentleman" as Defendant.

Agent McGrath helped construct a photo array that included Defendant's photograph and those of five other individuals. Defendant's photograph was obtained from the U.S. Virgin Islands Bureau of Motor Vehicles, while the other photographs depicted in the array were mug shots obtained from VIPD and DHS. Agent McGrath testified that when choosing photographs for the array, he looked for male subjects who were relatively of the same age as Defendant; had similar

---

an Amended Information. (Dkt. Nos. 23, 39). Defendant's co-defendant, Zayvon Acoy, was charged with all six counts in the Indictment. (Dkt. No. 53).

[2] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

complexions, facial hair, and bone structures as Defendant; and who were posing similarly to how Defendant was posing in his photograph. Jane Doe was shown this photo array and identified Defendant from the lineup as the "older gentleman" to whom she had referred in her interview.

On November 30, 2018, Defendant reported to the DHS office after Agent McGrath contacted him and asked him to report to the office to resolve an immigration-related issue. When Defendant arrived at the office, he was escorted to a small, enclosed room that contained three Agents, a video camera, a table, and chairs. Defendant sat alone on one side of the table; two Agents sat across from him; and one Agent sat at the head of the table. The table and the three Agents were between Defendant and the exit door.

When the interview began, Defendant was asked whether he needed any water. The three Agents introduced themselves to Defendant and showed him their badges. Agent McGrath took the lead and asked Defendant his name and whether he had any form of identification. Defendant provided Agent McGrath with his ID and social security card. Agent McGrath then showed Defendant a warrant that had been issued for his arrest. When Agent McGrath asked Defendant to read the *Miranda* rights, Defendant stated that he could not read. Agent McGrath read the *Miranda* rights to him aloud. As he was listening to the rights being read to him, Defendant nodded after hearing that he had the right to remain silent; said "mhm" after hearing that anything he said could be used against him; nodded and said "yeah" after hearing that he had a right to have an attorney present during questioning; and nodded and said "mhm" after hearing that he could stop questioning at any time. After he read the *Miranda* rights, Agent McGrath asked Defendant if he understood the rights that were read to him. Defendant said "yes." Agent McGrath proceeded to read the text of the *Miranda* waiver to Defendant aloud.

Defendant stated that he did not understand why he was being arrested. In response, Agent McGrath asked whether Defendant knew Acoy and stated that Defendant paid to have sexual relations with Acoy's girlfriend. Defendant immediately began to deny those facts, but the Agents interrupted him and told him that they could not discuss the subject with him unless he signed the *Miranda* waiver. When Agent McGrath was explaining that he could not speak to Defendant regarding the case unless Defendant waived the *Miranda* rights, Defendant asked: "can I get a lawyer?" As Agent McGrath was finishing his explanation, Defendant repeated: "can I get a lawyer?" Agent McGrath told him that he could get a lawyer if he wanted. Shortly thereafter, as Defendant was making spontaneous statements regarding the case, Agent McGrath stated that when Defendant went to court, he would have an attorney. Defendant then again denied the allegation that he had sexual relations with Acoy's girlfriend. In response, the Agents asked him whether he would like to talk to them without a lawyer. Defendant replied that he did not mind talking. The Agents told him that if he wanted to talk to them, he needed to sign the *Miranda* waiver, and Agent McGrath offered to read him the text of his *Miranda* rights again. Defendant did not respond to the offer.

Defendant stated that he could not write. One of the Agents asked him if he could write his name, to which he responded in the affirmative. However, Defendant stated that he did not want to sign the waiver because they would "lock him up" if he did. The Agents then explained that signing the waiver had nothing to do with the arrest warrant. Defendant stated that he did not "want to talk 'til [he had] a lawyer" because he "did not have any sex," and further told the Agents that he wanted to have a DNA test. He then attempted to continue speaking about the case, and the Agents told him that they needed him to sign the waiver before they could discuss the allegations with him. Defendant asked the Agents to listen to him, and the Agents told him they could not talk

to him without his signature, so if he would like to tell them his side of the story, he needed to sign the *Miranda* waiver. After the Agents told Defendant that he "either wanted an attorney or not," and they could not speak to him unless he signed the *Miranda* waiver, Defendant said: "maybe I get a lawyer, the lawyer come here and talk," to which Agent McGrath responded: "you don't have to sign if you don't want to sign—but we cannot discuss it." Soon after that, Defendant again voiced his concern that if he signed the waiver, he would get "locked up." He said: "me get a lawyer you still lock me up," and then denied the allegations until the Agents told him they could not talk about it unless he signed "the paper." They told him that if he wanted a lawyer, they could not speak to him without his lawyer present. Then, they explained that the warrant was already signed by a judge, and that he was going to jail regardless of whether he signed the waiver.

Defendant asked whether the Agents had any proof. The Agents told him that they could not discuss it without his waiver. For a second time, Agent McGrath asked Defendant if he would like to have the *Miranda* rights read to him again. Defendant did not respond. Instead, Defendant requested an attorney twice by saying: "go and get a lawyer, go and get a lawyer," to which Agent McGrath responded: "you want an attorney . . . if you want an attorney, that's fine" and began writing down notes. Agent McGrath testified that at this point the Agents were "backing off" and preparing to terminate the interview because they perceived the situation as Defendant asserting his right to counsel. Defendant then began speaking again, saying he "did not touch the girl" and asking the Agents to listen to him. The Agents reiterated that if Defendant wanted to talk to them and explain his side of the story, he had to sign the waiver. Defendant asked: "I going to get a lawyer?", to which the Agents responded that he could have a lawyer any time he wanted one. Defendant continued to speak, and the Agents told him that they wanted to speak to him, but they

could not do so unless Defendant signed the waiver. This entire situation occurred in the span of approximately eleven minutes.

In the eleven-minute span, Defendant referenced an attorney eight times—albeit not always unequivocally. These references were interspersed with Defendant's continuing spontaneous statements and repeated interruptions by the Agents as they cautioned him that they could not speak with him about the case unless he signed the *Miranda* waiver. After these exchanges, Defendant confirmed that he was going to jail whether he signed the waiver or not. He then signed the *Miranda* waiver and an interview of Defendant by the Agents ensued for approximately one hour and fifteen minutes.

## II.    DISCUSSION

In his Motion to Suppress and at the suppression hearing, Defendant argued that: (1) the photo array was unnecessarily suggestive; (2) the statements taken from him were in violation of *Miranda*; (3) his *Miranda* waiver was not made knowingly and voluntarily; and (4) his statements were involuntary under the Due Process Clause of the Fifth Amendment. (Dkt. No. 58 at 4-12). Accordingly, Defendant moves to suppress his photo identification and all of the statements that he made to law enforcement.

Defendant argues that the photo array was unduly suggestive because he is the only person in the array wearing a white shirt; the only person who does not have glossy eyes; the only person without gray hair; the only person without facial hair; and his photograph is the only one that is not a mug shot. (Dkt. Nos. 58 at 5-7; 58-1).

Defendant also argues that his statements were taken in violation of *Miranda*. *Id*. at 7. He asserts that because his requests for counsel were clear and unequivocal, the Agents conducting the interview should have ceased their questioning. *Id*. at 8. Defendant additionally contends that

after he invoked his right to counsel, the Agents pressured him to sign the *Miranda* waiver, in violation of *Miranda*. *Id*. at 9. Defendant further argues that Agent McGrath's question "do you know Acoy?" and his statement that Defendant paid to have sex with Acoy's girlfriend qualifies as interrogation in violation of his *Miranda* right to counsel.

Finally, Defendant argues that his statements were involuntary under the Due Process Clause of the Fifth Amendment. *Id*. In making this argument, Defendant claims that he was interrogated by three law enforcement Agents although he did not waive his *Miranda* rights "with a full awareness of the nature of the rights being abandoned and the consequences of the decision to abandon them." *Id*. at 10. Defendant maintains that because he cannot read or write and has a "very limited education background," and "there is no evidence that [he] has any prior dealing with the American criminal justice system," he did not give the statements voluntarily. *Id*. Defendant also alleges that his statements were "the direct result of the Agents' coercive tactics." *Id*. at 11.

At the hearing, the Government asserted that the photo array was not unduly suggestive because the individuals in the photo array are very similar in appearance—they all look approximately the same age (over 50); have facial hair, gray hair, mustaches, dark skin, rounder faces, similar noses, and similar eyes; and all of the photographs are similarly cropped. The Government also argues that, although Defendant was in custody, he was not being interrogated for *Miranda* purposes because he was not being asked incriminating questions. Additionally, the Government maintains that the Agents did not "initiate questioning of [Defendant] after a clear request for counsel," and that because Defendant reinitiated the conversation after requesting an attorney, and the Agents refused to speak with him until he signed the waiver, the Agents did not

violate his *Miranda* rights. (Dkt. No. 61 at 3). Finally, the Government contends that the Agents did not use coercive measures to obtain Defendant's "otherwise voluntary statements." *Id*. at 4.

### A. Photo Array

#### 1. Applicable Legal Principles

An identification procedure that is both "(1) unnecessarily suggestive and (2) creates a substantial risk of misidentification" violates a defendant's Fifth Amendment right to due process. *United States v. Brownlee*, 454 F.3d 131, 137 (3d Cir. 2006) (citing *Manson v. Brathwaite*, 432 U.S. 98, 107-08 (1977)). "Unnecessary suggestiveness 'contains two component parts: that concerning the suggestiveness of the identification, and that concerning whether there was some good reason for the failure to resort to less suggestive procedures.'" *Id*. (quoting *United States v. Stevens*, 935 F.2d 1380, 1389 (3d Cir. 1991)). "An impermissibly suggestive identification procedure can occur in four settings: a show-up, a photo array, a line-up[,] and in court." *Id*. (citation omitted).

The use of a photo array may violate due process "when police attempt to emphasize the photograph of a given suspect, or when circumstances surrounding the array unduly suggest who an identifying witness should select." *United States v. Lawrence*, 349 F.3d 109, 115 (3d Cir. 2003) (citing *Simmons v. United States*, 390 U.S. 377, 383 (1968)); *see also United States v. Ladson*, 238 Fed. App'x 874, 877 (3d Cir. 2007). However, "[a] photographic array is not unnecessarily suggestive solely because certain characteristics of a defendant or photograph set him apart from the other persons pictured in the array." *United States v. Burnett*, 773 F.3d 122, 133 (3d Cir. 2014) (citing *Reese v. Fulcomer*, 946 F.2d 247, 260 (3d Cir. 1991)). "The key question is whether differences in characteristics 'sufficiently distinguish' a defendant to suggest culpability." *Id*. (citing *Reese*, 946 F.2d at 260).

"In evaluating the suggestiveness of a photographic array, [a court must] examine the totality of the circumstances to determine whether the array's suggestiveness denied the defendant due process." *Lawrence*, 349 F.3d at 115 (citing *Brownlee*, 454 F.3d at 139). Specifically, a court considers various factors, including "the size of the array, its manner of presentation, and its contents." *Reese*, 946 F.2d at 260. Defendant bears the burden of proving that the photo array was unnecessarily suggestive. *Lawrence*, 349 F.3d at 115; *see also United States v. Clausen*, 328 F.3d 708, 713 (3d Cir. 2003).

An unnecessarily suggestive photo array alone "does not in itself require exclusion of the evidence." *Reese*, 946 F.2d at 259 (quoting *United States v. Dowling*, 855 F.2d 114, 117 (3d Cir. 1988), *aff'd*, 493 U.S. 342 (1990) (internal quotation marks omitted)). "A court should suppress an identification only where 'the photographic identification procedure was so suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Burnett*, 773 F.3d at 133 (quoting *Simmons*, 390 U.S. at 384 (alteration in *Burnett*)). "[R]eliability is the linchpin in determining the admissibility of identification testimony . . . ." *Stevens*, 935 F.2d at 1391 (quoting *Brathwaite*, 432 U.S. at 114) (internal quotation marks omitted). The Third Circuit has recognized that "courts should not reach the reliability inquiry unless the identification resulted from a situation created by improper police conduct." *United States v. Shavers*, 693 F.3d 363, 382 (3d Cir. 2012) (citing *Perry v. New Hampshire*, 132 S. Ct. 716, 728 (2012)); *see also United States v. Roland*, 545 Fed. App'x 108, 114 (3d Cir. 2013) (citing *Stevens*, 935 F.2d at 1389) (stating that the court need only engage in the "totality of the circumstances" analysis if the identification procedure was unnecessarily or impermissibly suggestive); *United States v. Smith*, 505 Fed. App'x 149, 152 (3d Cir. 2012) ("Only if a procedure was too suggestive need a court ask whether it should

nonetheless be admitted as reliable under the totality of the circumstances." (citing *Biggers*, 409 U.S. at 199)).

### 2. Analysis

Defendant bears the burden of establishing that the photo array was unnecessarily suggestive. *Lawrence*, 349 F.3d at 115. He has failed to carry his burden under the circumstances here.

A review of the photo array, which was introduced into evidence as Government Exhibit 3, reveals that all of the photographs in the array are of equal size, and that Defendant does not stand out from the other men depicted in any significant way. Except for being the only individual wearing a white shirt and whose photo is not a mug shot, Defendant was unable to point to any arguably distinguishable characteristics of Defendant's photograph that allegedly set him apart from the other individuals pictured. [3]

Defendant's white shirt is of no significance here because the individuals shown in the photo array are wearing shirts of various colors—there are photographs depicting dark-colored shirts, lighter colored shirts, a dark colored shirt with a white undershirt, and a photograph depicting a man who seems to not be wearing any shirt at all. Thus, Defendant's white shirt does not distinguish him from the other individuals pictured any more, for example, than the dark shirt

---

[3] Defendant's challenges to the photo array based on the color of his hair and the absence of facial hair appeared to have been withdrawn after a color copy of the photo array was produced by the Government at the hearing. The color copy depicts Defendant, correctly, with some gray hair and facial hair. To the extent that those challenges were not withdrawn, the Court finds that, because Defendant's photograph—like the other photographs—depicts an individual with some gray hair and facial hair, nothing about those features distinguishes Defendant's photograph from the others so as to render the array unnecessarily suggestive. Further, Defendant's vague challenge based on a claim that Defendant, unlike the individuals depicted in the other photographs, does not have "glossy eyes," is very difficult to comprehend and even more difficult to credit as a distinguishing factor that would suggest culpability—either on its face or based on the Court's review of the photo array.

with the white undershirt distinguishes that individual. *United States v. Dowling*, 855 F.2d 114, 117 (3d Cir. 1988) (concluding that a six-person photographic array was not unduly suggestive when the defendant was the only one wearing a red shirt because all individuals "were reasonably comparable in dress and appearance."). Given the variations in color of the shirts worn by the individuals in the array—as well as the apparent absence of a shirt by one individual—Defendant's white shirt does not "sufficiently distinguish" him from the other individuals so as to suggest culpability. *Burnett*, 773 F.3d at 133.

Further, Defendant's argument at the hearing that his photograph is the only one that is not a mug shot is also unavailing. *United States v. Hernandez*, 306 Fed. App'x 719, 722 (3d Cir. 2009) (finding that the use of a personal photo, instead of a mug shot, is not sufficient "to reach the high standard of unnecessarily suggestive[].").  Except for the testimony of Agent McGrath that the photographs of the other men were mug shots obtained from VIPD and DHS, there is nothing about the photographs themselves that reveals that all except for Defendant's photograph are mug shots. Defendant further claims that because all of the other photographs are mug shots, the men in those photographs look more solemn than Defendant. Defendant is clearly "grasping at straws" because his appearance is no less solemn than that of the others. In any event, even if it was apparent that Defendant's photograph is the only one that is not a mug shot—which it is not— "common sense suggests that a witness [would be] less likely to identify [his] photo than one appearing to be a 'mug shot'" because a mug shot implies that the person depicted in the photograph has a prior police record. *Lawrence*, 349 F.3d at 116. Accordingly, such a distinguishing factor—if it could even be considered as such under the circumstances here—would not suggest culpability.

In sum, Defendant has failed to show that the photo array was unduly suggestive. Because the Court has concluded that the array and its presentation were not unduly suggestive, it need not reach the reliability inquiry. *Shavers*, 693 F.3d at 382; *Smith*, 505 Fed. App'x at 152. Accordingly, Defendant's Motion to Suppress his photo identification and testimony pertaining to the identification of Defendant will be denied.[4]

### B. *Miranda* Challenge

### 1. Applicable Legal Principles

The Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966), held that the "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id*. at 444. *Miranda* warnings are required whenever a suspect has been (1) "taken into custody" and (2) subject to "interrogation" by the government. *Steigler v. Anderson*, 496 F.2d 793, 798 (3d Cir. 1974); *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010) (plurality opinion).

A suspect is "in custody" when "there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotations omitted)). Further, an "interrogation" has been defined as "(a) conduct intentionally designed to evoke a confession, as well as (b) any conduct an agent should reasonably have foreseen would elicit an inculpatory response." *United States v. Bonner*, 469 F. App'x 119, 126 (3d Cir. 2012) (citing *Rhode Island v. Innis,* 446 U.S. 291, 301 (1980)).

---

[4] Defendant also notes that the Government did not provide him with the description of him that Jane Doe relayed to the Agents. (Dkt. No. 58 at 5). The Court is not aware of any reason why this fact would impact the Court's ruling.

When a defendant invokes his right to counsel, law enforcement agents must cease asking questions until an attorney has been made available or the defendant reinitiates the conversation himself. *North Carolina v. Butler*, 441 U.S. 369, 372-376 (1979); *see also Davis v. United States*, 512 U.S. 452, 458 (1994). The *Miranda* right to counsel is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *McNeil v. Wisconsin*, 501 U.S. 171, 176 (1991); *Michigan v. Harvey*, 494 U.S. 344, 350 (1990). The Supreme Court has held that a defendant who has invoked the right to counsel cannot be questioned regarding any offense unless an attorney is present. *McNeil*, 501 U.S. at 176; *Minnick v. Mississippi*, 498 U.S. 146, 154 (1990); *Arizona v. Roberson*, 486 U.S. 675, 684 (1988).

Courts must "determine whether the accused actually invoked his right to counsel." *Fare v. Michael C.*, 442 U.S. 707, 719 (1979). This is an objective inquiry. *See Connecticut v. Barrett*, 479 U.S. 523, 529 (1987) (indicating that the inquiry is objective in order to avoid difficulties of proof and to provide guidance to agents conducting interrogations). A defendant's invocation of the *Miranda* right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *McNeil*, 501 U.S. at 209. However, if a defendant makes a reference to an attorney that is ambiguous or equivocal, questioning does not have to end. *See id.* ("[T]he likelihood that a suspect would wish counsel to be present is not the test . . . ."). Instead, the defendant must unambiguously request counsel. *Davis*, 512 U.S. at 459. If a defendant's request does not meet the requisite level of clarity, agents do not have to stop questioning the suspect. *See Moran v. Burbine*, 475 U.S. 412, 433 n. 4 (1986) ("[T]he interrogation must cease until an attorney is present only [i]f the individual states that he wants an attorney") (citations and internal quotation marks omitted).

An individual may waive his *Miranda* rights "provided the waiver is made voluntarily, knowingly[,] and intelligently." *Miranda*, 384 U.S. at 444. To determine whether an individual's waiver of *Miranda* rights is valid, courts must ask (1) whether it was voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion[,] or deception," and (2) whether it was "made with full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Velasquez*, 885 F.2d 1076, 1084 (3d Cir. 1989) (quoting *Burbine*, 475 U.S. at 421).

### 2. Analysis

#### i. Communications Prior to *Miranda* Waiver

There is no dispute that Defendant was in custody as confirmed by the arrest warrant that he was shown by Agent McGrath. Thus, only the second prong of the *Miranda* inquiry— "interrogation"—is at issue here. In that regard, although prior to the signing of the *Miranda* waiver there were communications between Defendant and the Agents, the central issue for purposes of the *Miranda* analysis is whether Agent McGrath's inquiry as to whether Defendant knew Acoy and his statement to Defendant that he paid to have sex with Acoy's girlfriend constituted an interrogation within the meaning of *Miranda* jurisprudence.[5] The Court finds in the negative.

First, Agent McGrath's question "do you know Acoy?" occurred in response to Defendant's statement that he did not understand why he was under arrest. Even more importantly,

---

[5] The rest of the communication between Defendant and the Agents before Defendant signed the *Miranda* waiver involved Defendant attempting to discuss information relating to the allegations and the Agents telling him that they could not discuss the information unless he signed the *Miranda* waiver. Questions that the Agents asked Defendant in this context were whether Defendant would like his *Miranda* rights to be read to him again; whether Defendant wanted to speak with them without an attorney present; and whether Defendant wanted an attorney—questions that clearly do not constitute interrogation for *Miranda* purposes.

whether Defendant knew Acoy is not reasonably likely to elicit an incriminating response. *See Brownlee*, 454 F.3d at 146 (noting that "the term 'interrogation' under *Miranda* refers to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect") (quoting *Innis*, 446 U.S. at 301 n.5) (ellipsis and quotations omitted)). The response, even if in the affirmative, is not incriminating. *Compare United States v. Briggs*, 273 F.3d 737, 741 (7th Cir. 2001) (concluding that a law enforcement officer asking a defendant what he meant when he said he was "going to die" did not constitute *Miranda* interrogation in part because "[o]nly questions that are 'reasonably likely to elicit an incriminating response from the suspect' are improper.") (quoting *Innis*, 446 U.S. at 301-02) *with United States v. Duncan*, 308 F. App'x 601, 608 n.6 (3d Cir. 2009) (Chagares, J., concurring) (pointing out that asking whether there was a gun in a defendant's pocket constituted interrogation because, "if answered in the affirmative, it was likely to elicit an incriminating response.") (citing *Innis*, 446 U.S. at 301). Accordingly, Agent McGrath's question "do you know Acoy?" does not constitute *Miranda* interrogation.

Second, the Court notes that Agent McGrath's statement to Defendant that he paid to have sex with Acoy's girlfriend is not a question but a declaratory statement. The Court recognizes that in some circumstances, statements can constitute *Miranda* interrogation. *See United States v. Walton,* 10 F.3d 1024, 1028 n.1 (3d Cir. 1993) ("We believe it self-evident that an assurance to a suspect that an agent has known him 'for a long time' [—] and that if he desires, he 'can tell us what happened off the cuff' [—] is the functional equivalent of questioning"). However, the Court finds that Agent McGrath's statement that Defendant paid to have sex with Acoy's girlfriend, which was in response to Defendant's inquiry as to why he was being arrested, does not constitute *Miranda* interrogation. Agent McGrath simply responded to Defendant's inquiry by describing the

essence of the crime with which Defendant was being charged. *Compare United States v. Moreno-Flores*, 33 F.3d 1164, 1169 (9th Cir. 1994) (holding that an agent's statement to the defendant that "agents had seized approximately 600 pounds of cocaine and that [he] was in serious trouble" was not an interrogation or its functional equivalent) *with United States v. Bizzell*, 347 F. App'x 787, 791 (3d Cir. 2009) (finding that when an agent expressly asked the defendant why he had a gun in response to the defendant's inquiry as to why he was being arrested, the defendant's statements were not admissible because he had not been issued any *Miranda* warnings).

In concluding that Agent McGrath's question and statement to Defendant do not constitute interrogation, the Court finds the case of *United States v. Benton*, 996 F.2d 642, 644 (3d Cir. 1993), to be instructive. In *Benton*, police were informed of a robbery, and Officer Patterson, who was familiar with the suspected robber, began traveling to the scene. *Id*. at 643. While driving to the scene, Officer Patterson observed the suspected robber (the defendant) bend down along a wooden door before standing up and walking in the opposite direction. *Id*. Soon thereafter, the defendant was handcuffed and put into the back of Officer Patterson's patrol car. *Id*. During this process, the defendant asked what was happening and Officer Patterson told him that they had received a report that he had robbed somebody with a gun. *Id*. Officer Patterson then went to the wooden door and discovered a firearm. *Id*. Once Officer Patterson returned to the patrol car, the defendant again asked what was happening. *Id*. Officer Patterson told him that he was going to be charged and that he had seen the defendant bending over, to which the defendant responded that "no one had seen him throw away the gun." *Id*.

The district court in *Benton* suppressed the defendant's statement, reasoning that it was "unnecessary" for Officer Patterson to tell the defendant that he had seen him bending over and that his statement was not a response to the defendant's question but "was a declaration to [the

defendant] that the police had evidence 'linking him to the gun' which was likely to elicit a response from [the defendant] protesting innocence or admitting guilt." *Id*. at 644. On appeal, the Third Circuit reversed the district court's decision and concluded that—even disregarding the defendant's earlier question regarding what was happening—the police did not conduct an interrogation or its functional equivalent. *Id*. In so holding, the Third Circuit stated:

> [I]t would be unreasonable to conclude that the police intentionally created circumstances likely to elicit a statement from [the defendant]. Patterson did nothing more than tell [the defendant] why he was being arrested. While we do not doubt that he lawfully could have told [the defendant] the charge against him and have said nothing more, we do not think that Patterson's act of describing an observation he made prior to the arrest constituted the functional equivalent of a custodial interrogation. Rather, this was a case in which [the defendant's] remarks were unforeseeable.

*Id*.

In view of the Third Circuit's reasoning in *Benton*, the circumstances here present an even more compelling case for the conclusion that no interrogation occurred. Like Officer Patterson, Agent McGrath was simply telling Defendant why he was being arrested in response to Defendant's inquiry. However, unlike Officer Patterson, Agent McGrath did not comment on any first-hand observations that he made that could be linked to the crime. Accordingly, the Court finds that Agent McGrath's question "do you know Acoy?" and statement that Defendant paid to have sex with Acoy's girlfriend do not constitute custodial interrogation. *See Brownlee*, 454 F.3d 146.

After Agent McGrath's question and statement in response to Defendant's inquiry as to why he was being arrested, Defendant made numerous statements. However, none of Defendant's statements were made in response to any questions by the Agents. Although the Agents were communicating with Defendant, they were insisting—in the face of Defendant's repeated attempts to communicate with them—that they could not speak to him unless he waived his *Miranda* rights. The Agents' behavior in informing Defendant that they could not speak to him unless he signed

the waiver does not constitute any type of statement, question, or conduct that is likely to elicit incriminating information. "Spontaneous statements made [by a suspect] 'without prompting'" do not implicate *Miranda* because they are not a product of interrogation. *United States v. Rose*, 189 F. Supp. 3d 528, 547 (D.V.I. 2016); *see also United States v. Young*, 233 F. App'x 114, 115 (3d Cir. 2007) (holding that a suspect's incriminating statements made immediately after police informed him of the crimes he was being charged with were spontaneous and voluntary, and not a result of custodial interrogation); *Bonner*, 469 F. App'x at 126 (finding that the defendant was not subject to interrogation in part because even after the agents "repeatedly admonished [him] that he was not supposed to speak with them, [the defendant] volunteered incriminating information without any direct questioning.").

Because none of Defendant's statements prior to signing the *Miranda* waiver were obtained in violation of the interrogation prong of *Miranda*, they will not be suppressed as custodial interrogation.

### ii.  Invocation of Right to Counsel

Defendant argues that because he clearly and unequivocally asserted his right to counsel, all of his statements were made in violation of *Miranda*. Defendant made eight references to an attorney between Agent McGrath's response as to why Defendant was being arrested and Defendant's signing of the *Miranda* waiver. The Court finds, however, that before Defendant signed the *Miranda* waiver, all statements that Defendant made were spontaneous and not the product of interrogation by the Agents. Therefore, the Agents did not violate Defendant's *Miranda* rights, including his right to have counsel present.

Once a defendant clearly and unequivocally asserts his right to counsel, the defendant can "not [be] subject to . . . interrogation until counsel has been made available to him, unless the

accused himself initiates further communication, exchanges[,] or conversations with the police."
*Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981); *see also Oregon v. Bradshaw*, 462 U.S. 1039, 1042-44 (1983) (plurality opinion) (holding that officers are required to scrupulously respect a suspect's request for a lawyer and not initiate further interrogation). Therefore, spontaneous statements that defendants make "without prompting" do not implicate *Miranda* because they are not a product of custodial interrogation. *United States v. Mercedes*, 69 F. App'x 38 (3d Cir. 2003) (finding that although the defendant invoked her right to counsel, there was no *Miranda* violation in part because she re-initiated conversation with the officers herself); *see also United States v. Conley*, 156 F.3d 78, 83 (1st Cir. 1998) ("*Edwards* does not bar the introduction into evidence of spontaneous utterances merely because the utterances occur subsequent to the accused's invocation of his right to counsel.").

Here, Defendant invoked his right to counsel several times. *McNeil*, 501 U.S. at 2209. However, after Defendant requested an attorney and before he signed the *Miranda* waiver, none of his statements were at the Agents' behest. On the contrary, Defendant repeatedly attempted to initiate conversation with the Agents, and the Agents continually advised Defendant that they could not speak with him unless he signed the *Miranda* waiver form. *Minnick*, 498 U.S. at 153. The Agents did not ask Defendant any questions that constituted interrogation before he signed the *Miranda* waiver.[6] Because Defendant was not subjected to interrogation after he invoked his right to counsel, the Agents did not violate *Miranda*. *Butler*, 441 U.S. at 372-376.

---

[6] The only questions that the Agents asked during this period were whether Defendant wanted an attorney; whether Defendant wanted his *Miranda* rights read to him again; and whether Defendant wanted to speak to them without an attorney present.

### iii.  *Miranda* **Waiver**

The Court must now consider whether, under the totality of the circumstances, the Government has shown by a preponderance of the evidence that Defendant waived his *Miranda* rights "voluntarily, willingly[,] and intelligently . . . ." *United States v. Stuckey*, 441 F.2d 1104, 1105 (3d Cir. 1971). Based on the evidence presented, the Court answers this question in the affirmative.

Defendant ultimately signed the *Miranda* waiver; however, Defendant did so only after invoking his right to counsel several times; proceeding to re-initiate conversation with the Agents; and having the Agents continuously advise him that they could not speak with him unless he signed the waiver. Whether a voluntary, knowing, and intelligent waiver exists depends on the totality of the circumstances. *Velasquez*, 885 F.2d at 1087.

In order to be valid, the *Miranda* waiver (1) "must have been voluntary 'in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception'" and (2) "'must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.'" *United States v. Richardson*, 265 F. App'x 52, 55 (3d Cir. 2008) (quoting *Burbine*, 475 U.S. at 421). The Court finds that Defendant was not coerced into waiving his *Miranda* rights and that Defendant waived his *Miranda* rights knowingly and intelligently.

First, the totality of the circumstances suggests that Defendant understood his *Miranda* rights and the consequences of waiving them. Defendant cannot read or write, so Agent McGrath read the *Miranda* rights and the *Miranda* waiver aloud to Defendant. When Agent McGrath was reading Defendant the *Miranda* rights, Defendant's words and conduct—as reflected in the videotaped interview—showed that he understood the rights that were being read to him. For

example, Defendant nodded after hearing that he had the right to remain silent; said "mhm" after hearing that anything he said could be used against him; nodded and said "yeah" after hearing that he had the right to have an attorney present during questioning; and nodded and said "mhm" after hearing that he could stop questioning at any time. Defendant also verbally stated that he understood his *Miranda* rights after Agent McGrath read them to him and asked him if he understood them. *Alston v. Redman*, 34 F.3d 1237, 1253 (3d Cir. 1994) (finding that the defendant "understood his *Miranda* rights when he signed the waiver," based on the defendant's execution of the form "and the testimony of the interrogating officers concerning their recitation of the rights and [the defendant's] acknowledgement that he understood them.").

Further, Defendant's waiver was not the product of coercion. The Court acknowledges that the Agents repeatedly asked Defendant to sign the *Miranda* waiver if he wanted to speak with them. Agent McGrath testified that he and the Agents were insisting that Defendant had to sign the waiver before they discussed the case with him in order to eliminate any confusion as to whether Defendant was waiving his *Miranda* rights. In view of Defendant's repeated spontaneous utterances, the Court finds that the Agents' persistence was to ensure that Defendant was, in fact, waiving his rights before they spoke to him regarding the allegations. The Court's review of the videotaped interview confirms this fact. Thus, the Court concludes that the Agents did not coerce Defendant into signing the waiver form.

Defendant also argues that he did not waive his rights knowingly in part because he did not possess the requisite knowledge about the criminal justice system. While the fact that Defendant expressed his belief that if he signed the *Miranda* waiver, he would be sent to prison could indicate an unfamiliarity with the criminal justice system, the Agents explained that this was not the case and that the warrant was something separate from the waiver. Before Defendant signed the

*Miranda* waiver, his understanding of the issue was reflected in his verbal confirmation that he was going to jail whether he signed the waiver or not. Moreover, Defendant's understanding of his *Miranda* rights, in particular, was reflected by his responses when Agent McGrath read the individual rights to him, as discussed above.

Defendant further argues that Agent McGrath's statement advising Defendant that he would get a lawyer when he goes to court renders his waiver involuntary. While this comment standing alone could have led to involuntariness on Defendant's part, the comment must be placed into the context of the totality of the circumstances, including several clarifying statements by the Agents. *United States v. Youte*, 769 F. App'x 685, 688 (11th Cir. 2019), *cert. denied*, 140 S. Ct. 64 (2019) (concluding that any ambiguities or misstatements in the defendant's translation of the *Miranda* rights were remedied by later clarifications and corrections). In this regard, prior to the comment in question, Agent McGrath correctly read Defendant the *Miranda* rights. Further, after the comment in question, the Agents informed Defendant that he could get an attorney whenever he wanted an attorney; that he did not have to sign the waiver if he did not want to; that if he wanted a lawyer, the Agents could not speak to him unless his lawyer was present; and that the Agents could not discuss the case with him unless he signed the waiver. Thus, given the totality of the circumstances, the Court concludes that Agent McGrath's one misleading comment does not render Defendant's waiver involuntary.

Accordingly, based on the totality of the circumstances, the Court finds that Defendant's waiver was not the product of coercion and was made knowingly and intelligently.

### C.    Voluntariness Under the Due Process Clause

Defendant argues that his statements were involuntary under the Due Process Clause of the Fifth Amendment because he was interrogated by three law enforcement Agents; he cannot read

or write; he has a "very limited education background"; and "there is no evidence that [he] has any prior dealing with the American criminal justice system." (Dkt. No. 58 at 10-11). It is undisputed that Defendant was in custody when he made statements to the law enforcement Agents, and that once he signed the *Miranda* waiver, he was subject to custodial interrogation. However, the Court concludes that the Government has shown by a preponderance of the evidence that Defendant's statements during the interview were voluntary.

### 1.    Applicable Legal Principles

With regard to the voluntariness of a statement, the Third Circuit looks to the "totality of [the] circumstances," to ensure that the statement is "the product of an essentially free and unconstrained choice by its maker, that it was the product of a rational intellect and a free will and that the appellant's will was not overborne." *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994) (internal citation and quotation marks omitted). These circumstances include taking into consideration

> the crucial element of police coercion; the length of the interrogation; its location; its continuity; the defendant's maturity; [the defendant's] education; [the defendant's] physical condition; and [the defendant's] mental health. They also include the failure of police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation.

*Swint*, 15 F.3d at 289 (internal citations omitted); *see also Rose*, 189 F. Supp. 3d at 538 (D.V.I. 2016). Moreover, "[a] suspect's background and experience, including prior dealings with the criminal justice system, should be taken into account in the voluntariness inquiry." *United States v. Jacobs*, 431 F.3d 99, 108 (3d Cir. 2005). "If an individual's will is overborne or that person's capacity for self-determination is critically impaired, her or his statements are involuntary," and thus not admissible into evidence. *Id*. To be involuntary, the statement must be "the product of police overreaching." *Swint*, 15 F.3d at 289 (internal citation and quotation marks omitted); *see also Jacobs*, 431 F.3d at 108 ("A necessary predicate to a finding of involuntariness is coercive

police activity.") (citing *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). Further, there must also be a "causal connection between the police conduct and the [statement.]" *Id*.

### 2. Analysis

Based on the totality of the circumstances, the Court concludes that Defendant's Due Process challenge fails.

First, the nature of the interaction reflects that Defendant was not subject to police coercion or overreaching. The interview took place in a professional atmosphere; Agent McGrath read Defendant the *Miranda* rights; Defendant was neither shackled nor handcuffed; the Agents were dressed in plain clothes, and none of them unholstered their weapon at any point; before the interview began, an Agent offered Defendant water; Defendant was not subject to repeated or prolonged questioning with his interview lasting approximately one hour and thirty minutes; and the tone of the Agents' questioning was not hostile. *See e.g., United States v. Granado*, 2012 WL 12888670, at *2, 7 (E.D. Pa. Feb. 9, 2012), *aff'd*, 523 F. App'x 153 (3d Cir. 2013) (finding that the defendant's statements to law enforcement officials were "not tainted by any coercive police action," where, *inter alia*, the defendant's interviews took place in an interview room, the officers "did not display any hostility, nor did they threaten, assault, or direct any violence against [the defendant]," and the interviews the defendant was subjected to were "relatively short," i.e., between an hour and two hours); *United States v. Lenegan*, 2008 WL 4058715, at *6 (E.D. Pa. Aug. 22, 2008), *aff'd*, 425 F. App'x 151 (3d Cir. 2011) (finding that the defendant's statements were made voluntarily where there was nothing in the record to indicate "police coercion . . . and [t]he federal agents present were dressed in street clothes and did not display their weapons during the session."). As discussed above, the Agents' repeated requests that Defendant sign the *Miranda* waiver before speaking to them about the case did not constitute coercion.

Further, upon the Court's review of Defendant's videotaped interview, the Court finds that Defendant did not appear to have a mental or physical disability or be under the influence of drugs or alcohol. There is also nothing in the record which suggests that Defendant's age, maturity, mental health, or physical health at the time of the interview rendered him incapable of making voluntary statements to law enforcement. *United States v. Mattox*, 2018 WL 3622777, at *6 (M.D. Pa. July 30, 2018).[7]

Accordingly, based on the totality of the circumstances, the Court finds that Defendant's statements before and after he signed the *Miranda* waiver were voluntary.

---

[7] The Court notes that, as discussed in Section II.B.2.iii., Defendant's alleged unfamiliarity with the criminal justice system was remedied by the Agents clarifying the *Miranda* rights and the *Miranda* waiver when Defendant appeared confused. Additionally, as discussed in Sections II.B.2.i.-ii., the statements Defendant made before he signed the *Miranda* waiver were spontaneous and not the product of interrogation or coercion. *United States v. Daniels*, 2010 WL 2163844, at *4 (E.D. Pa. May 27, 2010) ("[A]bsent deliberately coercive or improper tactics in obtaining [a] statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion.") (quoting *Oregon v. Elstad*, 470 U.S. 298, 314 (1985)); *see also Miranda*, 384 U.S. at 478 ("Any statement given freely without any compelling influences is, of course, admissible in evidence.").

### III.    Conclusion

For the reasons discussed above, the Court finds that: (1) the photo array was not unduly suggestive; (2) Defendant's *Miranda* right to counsel was not violated; (3) Defendant waived his *Miranda* rights knowingly and voluntarily; and (4) Defendant's statements were voluntary. Accordingly, the Court will deny Defendant's Motion to Suppress.

An appropriate Order accompanies this Memorandum Opinion.

Date: March 7, 2020

_____/s/_____
WILMA A. LEWIS
Chief Judge